*Technologies*

LINE OF CREDIT LOAN AND SECURITY AGREEMENT dated as of May    , 2002 between Corstar Business Computing Co., Inc., having an address at 50 Saw Mill River Road, Hawthorne, New York 10532 (the "Borrower") and Netstar, LLC, having an address at *10 Hageman CT Somers N.Y 10536* (the "Lender"). The parties hereto agree as follows:

## Article I

## AMOUNT AND TERMS OF THE LOANS

**Section 1.01. Line of Credit.** The Lender agrees on the terms and conditions hereinafter set forth, to make loans (the "Advances") to the Borrower from time to time during the period from the date of Agreement up to the Maturity Date of the Line of Credit Note referred to in Section 1.04 in an aggregate principal amount not to exceed at any one time Two Hundred Fifty Thousand Dollars ($250,000) (the "Loan"). Each Advance which shall not utilize the Commitment in full shall be in an amount not less than Ten Thousand Dollars ($10,000).

**Section 1.01. Notice and Manner of Borrowing.** The Borrower shall give the Lender at least ten (10) business days' notice of any Advances under this Agreement, specifying the date and amount thereof. Provided that Borrower is not then in default of the terms of this Agreement , the Lender will make such Advance available to the Borrower in immediately available funds as agreed to by the parties.

**Section 1.03. Interest.** The Borrower shall pay interest to the Lender on the outstanding and unpaid principal amount of the Advances made under this Agreement at a rate per annum equal to the rate of interest announced publicly by JP Morgan Chase from time to time as its base rate, plus one percent (1%). Interest shall be calculated on the basis of a year of three hundred sixty (360) days for the actual number of days elapsed. Interest on the outstanding Advances shall be paid within ten (10) days after the end of each calendar quarter during the term of this Agreement and on maturity.

**Section 1.04. Notes.** All Advances made by the Lender under this Agreement shall be evidenced by, and repaid with interest in accordance with, a single promissory note of the Borrower in substantially the form of Exhibit A, duly completed, in the principal amount of Two Hundred Fifty Thousand Dollars ($250,000), dated the date of this Agreement, payable to the Lender, and maturing as to principal on the Maturity Date (the "Line of Credit Note"). The Lender is hereby authorized by the Borrower to endorse on the schedule attached to the Line of Credit Note the amount of each Advance and of each payment of principal received by the Lender on account of the Advances, which endorsement shall, in the absence of manifest error, be conclusive as to the outstanding balance of the Advances made by the Lender; provided, however, that the failure to make such notation with respect to any Advance or payment shall not limit or

otherwise affect the obligations of the Borrower under his Agreement or the Line of Credit Note.

**Section 1.05. Prepayments.** The Borrower may prepay the Loan in whole or in part with accrued interest to the date of such prepayment on the amount prepaid, provided that each partial prepayment shall be in a principal amount not less than Ten Thousand Dollars ($10,000).

**Section 1.06. Grant of Security by Interest.** As security for the prompt payment and faithful performance of the Obligations, Borrower hereby pledges and assigns to Lender, and grants to Lender, a continuing security interest in all rights, titles and interests of Borrower, whether now owned or hereafter existing or acquired, in and to the following (the "Collateral):

All accounts and general intangibles (each as defined in the Uniform Commercial Code) of Borrower constituting a right to the payment of money, whether or not earned by performance, including, but not limited to, all moneys held in bank, savings, demand deposit or other depositary accounts, of any type whatsoever, and all moneys due and to become due to Borrower in repayment of any loans or advances, in payment for goods and services, in payment of tax refunds and in payment of any guarantee of any of the foregoing.

## Article II

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender that:

**Section 2.01. Incorporation, Good Standing, and Due Qualification.** The Borrower is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of New York and has the corporate power and authority to own its assets and to transact the business in which it is not engaged or proposed to be engaged in.

**Section 2.02. Corporate Power and Authority.** The execution, delivery, and performance by the Borrower of this Agreement have been duly authorized by all necessary corporate action and do not and will not (1) require any consent or approval of the shareholders of such corporation; (2) contravene such corporation's charter or bylaws; (3) violate any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination, or award presently in effect having applicability to such corporation and  (4) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which such corporation is a party or by which it or its properties may be bound or affected.

**Section 2.03. Legally Enforceable Agreement.** This Agreement and the Line of Credit Note are legal, valid, and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, and other similar laws affecting creditors' rights generally.

**Section 2.04. Debt or Liens.** No debt of the Borrower is secured by or otherwise benefits from any lien on or with respect to its assets or properties, except as set forth in an agreement between the Borrower, Merrill Lynch Business Financial Services, Inc. and Deutsche Financial Services Corporation (which debt is referred to herein as the "Permitted Debt" and which agreement is referred to as the "Settlement Agreement").

**Section 2.05. Litigation.** Except as provided in the Settlement Agreement, there is no suit, legal action or proceeding pending against, or to the knowledge of the Borrower threatened against or affecting the Borrower before any court or arbitrator or any governmental body, agency or official which, if adversely determined, could, in the reasonable judgment of the Borrower or Lender, materially adversely affect the financial condition of the Borrower or the validity or enforceability of, or the ability of the Borrower to perform its obligations under, this Agreement and the Line of Credit Note.

**Section 2.06. No Defaults.** No event has occurred or failed to occur and no condition exists which, upon the execution and delivery of this Agreement, would constitute an Event of Default or would, with the giving of notice or the lapse of time, or both, constitute an Event of Default as referred to in Article V. Neither Borrower nor any other person or entity for whose debts the Borrower may be liable is in violation of any legal requirement or of the Borrower's governing documents or of any agreement or other instrument to which any of them is a party or by which it or any of its assets or properties is bound, which violation might in any material way affect the validity of this Agreement or affect the ability of the Borrower to materially perform this Agreement (by payment or otherwise) or to pay the principal of and interest on the Loan and all other sums payable under this Agreement the Line of Credit Note when due.

**Section 2.07. Financial Statements.** The Borrower has furnished to the Lender its financial statements (including balance sheet, income statement, and statements of retained earnings and of cash flow) as of March 31, 2002, as prepared by the internal management of the Borrower. Such financial statements present fairly the financial condition of the Borrower as of such date. Since such date, there has been no material adverse change in the financial condition of the Borrower.

Section 2.08. **Full Disclosure.** There is no fact known to the Borrower which has not been disclosed in writing to the Lender which would have a material adverse effect on its financial condition.

Section 2.09. **Taxes.** The Borrower has filed all United States Federal income tax returns and all other material tax returns which are required to be filed by it and has paid all taxes (whether Federal, State, local or foreign jurisdiction) due by it or pursuant to any assessment received by it.

Section 2.10. **Title to Property; Ownership.** The Borrower has good and marketable title to all of its properties and assets. The issued and outstanding capital stock of the Borrower are owned of record and beneficially as set forth on Schedule 3.13 annexed hereto.

# Article III

## AFFIRMATIVE COVENANTS

So long as any Note shall remain unpaid or the Lender shall have any Commitment under this Agreement, the Borrower will:

Section 3.01. **Maintenance of Existence.** Preserve and maintain its corporate existence and good standing in the jurisdiction of its incorporation.

Section 3.02. **Maintenance of Records.** Keep adequate records and books of account reflecting all financial transactions of the Borrower.

Section 3.03. **Maintenance of Properties.** Maintain, keep, and preserve all of its properties (tangible and intangible) necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted.

Section 3.04. **Conduct of Business.** Continue to engage in an efficient and economical manner in a business of the same general type as conducted by it on the date of this Agreement.

Section 3.05. **Maintenance of Insurance.** Maintain insurance with financially sound and reputable insurance companies or associations in such amounts and covering such risks as are usually carried by companies engaged in the same or a similar business and similarly situated, which insurance may provide for reasonable deductibility from coverage thereof.

**Section 3.06. Compliance With Laws.** Comply in all respects with all applicable laws, rules, regulations, and orders, such compliance to include, without limitation, paying before the same become delinquent all taxes, assessments, and governmental charges imposed upon it or upon its property.

**Section 3.07. Right of Inspection.** At any reasonable time and from time to time, permit the Lender or any agent or representative thereof to examine and make copies of and abstracts from the records and books of account of, and visit the properties of, the Borrower, and to discuss the affairs, finances, and accounts of the Borrower with any of their respective officers and directors and the Borrower's independent accountants.

## Article IV

### NEGATIVE COVENANTS

In addition to the other undertakings contained in this Agreement, the Borrower hereby covenants to the Lender that, until the principal amount of the Loan, all interest thereon and all other amounts payable under this Agreement and the Line of Credit Note have been paid to the Lender in full, without the prior written consent of Lender in its sole discretion, the Borrower shall not:

**Section 4.1. Liens.** Except with respect to the Permitted Debt, create, assume or suffer to exist any lien securing debt on any asset or property of the Borrower.

**Section 4.2 Merger, etc.** Liquidate, dissolve, terminate or otherwise cease its operations, or sell substantially all of its assets or otherwise merge into, or consolidate with, any other entity.

**Section 4.3. Ownership; Governing Documents.** Change the organizational structure of the Borrower, or the management, officers or directors of the Borrower or change the status of or otherwise change, amend or modify any of the Borrower's governing documents in a manner which would cause a material adverse effect.

**Section 4.4. No Additional Debt.** The Borrower shall not incure any additional debt other than the Permitted Debt.

**Section 4.5. Other Covenants.** In addition to the other undertakings contained in this Agreement, the Borrower hereby covenants to the Lender that, until the principal amount of the Loan, all interest thereon and all other amounts payable hereunder have been paid to the Lender in full, the Borrower shall not:

(i)  issue any shares of stock of Borrower (except as provided in Article VII hereof), purchase, redeem, retire or otherwise acquire for value any of its ownership interests now or hereafter outstanding; or make any distribution of assets to its stockholders, as the case may be, as such whether in cash, assets or in obligations of the Borrower; or allocate or otherwise set apart any sum for the payment of any dividend or distribution on, or for the purchase, redemption or retirement of any interest; or make any other distribution by reduction of capital (except pursuant to depreciation) or otherwise in respect of any ownership interests

(ii)  make any loan or advance to any person or entity, or purchase or otherwise acquire, any capital stock, assets, obligations or other securities of, make any capital contribution to or otherwise invest in or acquire any interest in any person, or participate as a partner or joint venture with any other Person.

## Article V

## EVENTS OF DEFAULT

**Section 5.01.  Events of Default.**  If any of the following events shall occur:

(1)  The Borrower should fail to pay any amount due under theLine of Credit Note within fifteen (15) days after such amount becomes due and payable.

(2)  Any representation or warranty made or deemed made by the Borrower in this Agreement shall prove to have been incorrect, incomplete, or misleading in any material respect on or as of the date made or deemed made;

(3)  The Borrower shall fail to perform or observe any term, covenant, or agreement contained in Articles III and IV hereof; or

(4)  The Borrower (a) shall generally not pay, or shall be unable to pay, or shall admit in writing its inability to pay its debts as such debts become due; or (b) shall make an assignment for the benefit of creditors, or petition or apply to any tribunal for the appointment of a custodian, receiver, or trustee for it or a substantial part of its assets; or (c) shall commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; or (d) shall have had any such petition or application filed or any such proceeding commenced against it in which any order for relief is entered or an adjudication or appointment is made, and which remains undismissed for a period of ninety (90) days or more;

then; and in any such event, the Lender may, by notice to the Borrower, (1) declare its obligation to make the Loan to be terminated, whereupon the same shall forthwith terminate, and (2) declare the outstanding Line of Credit Note, all interest thereon, and all other amounts payable under this Agreement to be forthwith due and payable, whereupon the Line of Credit Note, all such interest, and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by the Borrower.

## Article VI

## LENDER'S RIGHTS

6.01.  **Authority to Collect.**  (a)  Except as and to the extent otherwise provided by herein, until such time as Lender shall notify Borrower of the revocation of such power and authority after the occurrences of a default, Borrower (i) may, in the ordinary course of its business, at its own expense, sell or lease or furnish under contracts of service any of the inventory normally held by Borrower for such purpose, and use and consume, in the ordinary course of its business, any raw materials, work in process or materials normally held by Borrower for such purposes, (ii) shall, at its own expense, endeavor to collect, as and when due, all amounts due with respect to any of the Collateral, including the taking of such action with respect to such collection as Lender may reasonably request or, in the absence of such request, as Borrower may deem advisable, and (iii) may grant, in the ordinary course of business to any account borrower, any rebate, refund or allowance to which such account borrower may lawfully be entitled, and may accept, in connection therewith, the return of goods, the sale or lease of which shall have the given rise to accounts receivable. Lender, however, may, at any time after the occurrence of a default, whether before or after any revocation of such power and authority or the maturity of any of the obligations, notify any or all of the account borrowers to make direct payment to Lender of any amounts due or to become due to Borrower under any account receivable, and enforce payment of, collect and receipt for all such amounts by suit or otherwise, and to compromise or settle any claim based thereon and renew or extend any indebtedness therefor. Borrower hereby authorizes and instructs each of its account borrowers to make payment of such amounts to Lender, upon and after receipt of such notice from Lender, without further notice or authorization for Borrower.  Upon the request of Lender after the occurrence of a default, however, Borrower shall, at its own expense, promptly notify any or all account borrowers to make payment to Lender, for the account of the Lenders, or any amounts due or to become due under accounts receivable.

(b)  After the occurrence of a default and upon and after the request of Lender therefor, Borrower shall forthwith, upon receipt, transmit and deliver to Lender, for the account of Lender, in the form received, all cash, checks, drafts, chattel paper and other instruments or writings for the payment of money (properly endorsed, where

required, so that such items may be collected by Lender) which may be received by Borrower at any time in full or partial payment of accounts receivable or otherwise as proceeds of any of the Collateral. Except as Lender may otherwise consent in writing, any such items which may be received by Borrower after such request will not be commingled with any other of Borrower's funds or property, but will beheld separate and a part from its own funds or property, and upon express trust for the Lender until delivery is made to Lender, Borrower will comply with the terms and conditions of any consent given by Lender pursuant to the provisions of this paragraph.

(c) Lender shall apply all amounts received by it pursuant hereto toward payment of the Loan, in such order of application as provided in this Agreement.

(d) Lender is hereby authorized and irrevocably appointed (with full power of substitution) Borrower's true and lawful attorney in fact, to execute or endorse, in its own name or in Borrower's name and stead, any checks, drafts, notes, money orders or other items representing payment on or other proceeds of accounts receivable, and such other documents as may be necessary or appropriate for the exercise of its collection rights under this Article 6.

Section 6.02.  Undertakings and Agreements of Borrower.  Borrower shall:

(a) Deliver to Lender concurrently with the execution and delivery of this Agreement (or, in the case of after-acquired Collateral, promptly upon receipt thereof), all instruments included in the Collateral (including without limitation, all chattel papers, notes, drafts, bills of lading, and warehouse receipts comprising any portion thereof) and not previously delivered, for possession by Lender; and upon request of Lender, execute such financing statements and other documents (and pay the cost of filing or recording the same in all public offices deemed necessary or appropriate by Lender) and do such other acts and things as Lender may from time to time request to establish and maintain a valid pledge of, and perfected security interest in, the Collateral, to secure the payment of the Loan;

(b) Keep, at its address set forth above, all its records concerning the Collateral, which records will be of such character as will enable Lender or its designees to determine at any time the status thereof;

(c) Furnish Lender such information concerning the Collateral, Borrower and the account borrowers as may be required by Agreement, or as Lender may from time to time reasonably request, and permit Lender and its designees, from time to time, to inspect the inventory and equipment and to inspect, audit and make copies of and extracts from all records and all other papers which Borrower possesses or to which it has access and which pertain to the Collateral, and, upon request of Lender, deliver to Lender

all of such records and papers; and, upon request of Lender, stamp on its records concerning the Collateral a notation, in form satisfactory to Lender, of the security interest of Lender hereunder.

(d) Reimburse Lender upon demand for all expenses, including reasonable attorneys' fees and legal expenses, incurred by or on behalf of Lender in seeking to collect, preserve, protect, or enforce any rights in the Collateral and, in case of default, incurred by Lender in seeking to collect the Loan and to enforce or exercise any of its rights hereunder, plus interest thereon from the date of disbursements at the maximum contract rate permitted to be charged Borrower by applicable law; and

(e) Execute and deliver to Lender such amendments and supplements to this Agreement, as may from time to time be necessary or appropriate to subject to the security interest granted hereby all property and interests of Borrower contemplated to be subjected thereto pursuant to the Credit Agreement, and to provide all information in connection therewith required to be provided pursuant to such section.

**6.03. Remedies.** Upon a default, Lender, in addition to any and all other rights and remedies provided for herein or under applicable law, in its discretion and without demand or notice of any kind (except to the extent required by law), may take any one or more of the following actions, without liability except to account for funds actually received; and Borrower hereby irrevocably constitutes and appoints Lender and any officer thereof (with full power of substitution) Borrower's true and lawful attorney-in-fact, with full power, in its own name or in Borrower's name and stead, to execute and deliver all documents and to take all other actions necessary or appropriate to accomplish any of the following (all as fully as Borrower might do) and Borrower hereby ratifies all that said attorney shall lawfully do by virtue hereof;

(a) Apply toward the payment of the Loan any and all balances, credits, deposits, accounts or moneys of or in the name of Borrower then or thereafter held by Lender;

(b) Exercise any and all rights and remedies of a secured party under the Uniform Commercial Code as then in effect in the jurisdictions in which the Collateral is located;

(c) Require Borrower, at its expense, to assemble any or all inventory and equipment at a convenient place acceptable to Lender (and Borrower hereby undertakes and agrees to do so);

(d) Have a receiver appointed to take charge of all or any part of the Collateral; and

(e)  To the fullest extent permitted by applicable law, without notice, advertisement, hearing or process of law of any kind, sell any or all of the Collateral, free of all rights and claims of Borrower therein and thereto at any public or private sale, and bid for and purchase any or all of the Collateral at any such public or private sale.  Any notification of intended disposition of any of the Collateral required by law shall be deemed reasonably and properly given if given at least ten (10) days before such disposition.  Any proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to the payment of expenses in connection with retaking, holding, preparing for sale, selling and otherwise dealing with the Collateral in any manner permitted hereby, including reasonable attorneys' fees and legal expenses, and any balance of such proceeds shall be applied by Lender toward the payment of such of the Obligations, and in such order of application, as Lender may elect.

**6.04.  Redemption Rights.**  Notwithstanding any other provision hereof or of the Loan Documents, Borrower shall have the right, at any time prior to the commencement of any judicial or non-judicial foreclosure sale, to terminate any judicial or non-judicial foreclosure proceedings by paying to Lender in immediately available funds the total amount of all Obligations outstanding on the date of such payment.

**6.05.  General Provisions.**  (a)  Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in its possession if it takes such action for that purpose as Borrower requests by notice to Lender, but failure to comply with such request shall not of itself be deemed a failure to exercise reasonable care, and no failure of Lender to preserve and protect any rights with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Borrower shall be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral.  Lender shall be under no duty to exercise or refrain from exercising any of the rights, powers and privileges granted hereby, and shall not be responsible for any failure to do so or delay in so doing.  Lender may add or release any guarantor, endorser, surety or other party to any of the Collateral or the Loan, and take or release any other collateral as security for the Loan.

(b)  In addition to the lien and rights arising hereunder, in the event any suit is brought on any loan document, any judgment obtained in such suit shall by its terms constitute a lien on, and may be enforced against, the Borrower or any property of Borrower (together with the income therefrom, any funds held by Lender  pursuant to this Agreement, insurance and condemnation proceeds and escrow and security deposits).

**Article VII**

10

OPTION TO CONVERT

**Section 7.01      Option.**    Subject to compliance with the condition set forth in Section 7.07, at any time during the term of the Agreement Lender shall have the right to convert all or any portion of the outstanding balance due from Borrower into shares of common stock of Borrower upon the terms set forth below.

**Section 7.02      Exercise of the Option.**    Lender shall exercise its option by notice to Borrower setting forth the amount of the outstanding balance to be converted to equity, which amount shall be not less than $25,000.  The exercise by Lender of its option as to a portion of the outstanding Loan balance shall not in any way limit the Lender's right to further exercise its option on one or more occasions as to the remaining outstanding balance.

**Section 7.03      Conversion Terms.**    Lender shall be entitled to receive common shares (which shall be rounded to the nearest share) of Borrower for any portion of the Loan converted which shall equal that percentage of the issued and outstanding shares of Borrower, after issuance of the conversion shares, determined by the fraction having a numerator which is the amount of the Loan to be converted and a denominator of 300,000.  Borrower shall deliver to Lender a duly authorized and validly issued certificate for the shares within ten (10) days from the date of Lender's notice exercising its option.

**Section 7.04      Change in Number of Shares Issued.**    If at any time after the date of this Agreement and before the option is exercised, Borrower has issued any shares other than pursuant to the provisions of this Article (the "Surplus Shares"), the conversion terms set forth in Section 7.03 shall be deemed amended and the amount of debt to be converted into one common share of Borrower shall be determined by dividing 300,000 by the sum of 100 plus the number of Surplus Shares issued.

**Section 7.05      Power of Attorney.**    If Lender exercises its option and does not receive a certificate within the time provided in Section 7.02, Borrower shall be deemed to have granted to Borrower a power of attorney coupled with an interest to make transfers on the Borrower's books and to cause a certificate to be issued on Borrower's behalf.

**Section 7.06      Assignment of Option.**    Lender shall have the right to assign this option in whole or in part to Steven Sitar, Kristen Sitar, or any of their issue.  No assignment will be effective unless Borrower is given written notice thereof.

**Section 7.07     Condition to Exercise of Option.**   Lender's option to convert shall be conditioned upon Lender entering into a shareholder agreement with John F. Sitar pursuant to which the shareholders agree that consent of both shareholders is required for (a) any sale of substantially all of the assets of Borrower or any other action outside the normal course of Borrower's business, or (b) and sale by a shareholder of any of such shareholder's shares of Borrower.

## Article VIII

### MISCELLANEOUS

**Section 8.01.     Amendments, Etc.**   No amendment, modification, termination, or waiver of this Agreement shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**Section 8.02.     Notices, Etc.**   All notices and other communications provided for under this Agreement shall be in writing (including telegraphic, telex, and facsimile transmissions) and mailed or transmitted or delivered at the addresses for each party set forth above, or at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 8.02.   Except as is otherwise provided in this Agreement, all such notices and communications shall be effective when deposited in the mails or delivered to the telegraph company, or sent, answerback received, respectively, addressed as aforesaid.

**Section 8.03.   No Waiver.**   No failure or delay on the part of the Lender in exercising any right, power, or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, or remedy preclude any other or further exercise thereof or the exercise of any other right, power, or remedy hereunder. The rights and remedies provided herein are cumulative, and are not exclusive of any other rights, powers, privileges, or remedies, now or hereafter existing, at law or in equity or otherwise.

**Section 8.04.   Successors and Assigns.**   This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns, except that the Borrower may not assign or transfer any of its rights under this Agreement or the Line of Credit Note without the prior written consent of the Lender.

**Section 8.05.   Governing Law.**   This Agreement and the Line of Credit Note shall be governed by, and construed in accordance with, the laws of the State of New York.

**Section 8.06.    Severability of Provisions.**    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions or affecting the validity or enforceability of any such provision in any other jurisdiction.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

CORSTAR                    BUSINESS
COMPUTING CO., INC.

By: _____
          John F. Sitar

NETSTAR TECHNOLOGIES, LLC

By: _____
          Steven Sitar

# LINE OF CREDIT NOTE

$250,000                                                            May  , 2002

FOR VALUE RECEIVED, the undersigned, Corstar Business Computing Co., Inc. (the "Borrower"), HEREBY PROMISES TO PAY to the order of Netstar, LLC (the "Lender"), at 10 Hageman Court, Somers, New York 10536, in lawful money of the United States and in immediately available funds, the principal amount of  Two Hundred Fifty Thousand Dollars ($250,000) or the aggregate unpaid principal amount of all Advances made to the Borrower by the Lender, whichever is less, on May 31, 2005 (the "Maturity Date"), and to pay interest from the date hereof on the unpaid principal amount of this Line of Credit Note, in like money, at said office, at the rate of interest announced publicly by JP Morgan Chase form time to time as its base rate, plus one percent (1%), payable on the first day of each calendar quarter of each year during the term of this Line of Credit Note beginning July 1, 2002, and at maturity.

The Borrower hereby authorizes the Lender to endorse on the Schedule annexed to this Line of Credit Note all Advances made to the Borrower, which endorsements shall, in the absence of manifest error, be conclusive as to the outstanding principal amount of all Advances; provided, however, that the failure to make such notation with respect to any Advance shall not limit or otherwise affect the obligations of the Borrower under the Line of Credit Loan Agreement or this Line of Credit Note.

This Line of Credit Note is the Note referred to in the Line of Credit Loan and Security Agreement between the Borrower and the Lender executed contemporaneously with this Note (the "Line of Credit Loan Agreement").  Terms used herein which are defined in the Line of Credit Loan Agreement shall have their defined meanings when used herein.  The Line of Credit Loan Agreement, among other things, contains provisions for acceleration of the maturity of this Line of Credit Note upon the happening of certain stated events and also for prepayments on account of the principal of this Line of Credit Note prior to the maturity of the Line of Credit Note upon the terms and conditions specified in the Line of Credit Loan Agreement.

This Line of Credit Note shall be governed by the laws of the State of New New York.

Corstar Business Computing Co., Inc.

By: _____

## SCHEDULE TO LINE OF CREDIT NOTE

| Date | Amount of Loan | Amount of Principal Prepaid | Unpaid Principal Balance of Line of Credit Note | Name of Person Making Notation |
|---|---|---|---|---|
| 5/31/02 | 100,000 | | | |
| 5/31/02 | 24,384 | | | |
| 6/5/02 | 28,644 | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

C:\MYFILES\CORSTAR LINE OF CREDIT NOTE WITH NETSTAR.DOC  January 4, 1999 (2:43PM)