**MINTZ & FRAADE, LLP**

Kevin J. McGraw
Of Counsel

488 MADISON AVENUE

NEW YORK, N.Y. 10022

TELEPHONE: (212) 486-2500
FACSIMILE: (212) 486-0701

February 19, 2004

Mr. Steven Sitar
Corstar Communications, LLC
40 Saw Mill River Road
Hawthorne, New York 10549

Dear Steven:

Enclosed please find a set of the Asset Purchase Agreement and the two consulting agreements. Please remember that you need to send me an asset list as of the closing date so that I can prepare a bill of sale.

I have also enclosed a bill for my services which I have addressed to both Corstar Business Computing Co. and Corstar Communications, LLC. I will leave it up to you and your father as to any allocation of payment. I should mention that the bill includes any time involved in document preparation and meetings with you and your father, but excludes a significant amount of time spent on the telephone with your father. Given my assumption that you will be paying all or most of the bill, I did not consider it fair to include those time charges in the bill.

Please give me a call if you have any questions regarding the transaction, or need any additional information from me,

Best regards.

Sincerely

Kevin J. McGraw

KJM:fe
Enclosures

## ASSET AND BUSINESS PURCHASE AGREEMENT

AGREEMENT, dated this *29* day of January, 2004, by and between Corstar Business Computing Co., Inc, a New York corporation having its principal office at 40 Saw Mill River Road, Hawthorne, New York 10532 ("Seller") and Corstar Communications, LLC, having its principal offices at 40 Saw Mill River Road, Hawthorne, New York ("Buyer").

WHEREAS, Seller conducts certain business operations involving the sale of certain computer technology services and related products;

WHEREAS, Buyer desires to purchase from Seller substantially all of the assets and operations of Seller (the "Business") and is willing to assume certain liabilities and obligations in respect thereof which are specifically identified in this Agreement; and

WHEREAS, Seller wishes to sell substantially all of the assets and the operations of the Business to Buyer, and transfer certain liabilities and obligations of Seller as specifically identified herein, all upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants, representations, warranties and agreements contained herein, the parties hereby agree as follows:

1.    <u>PURCHASE AND SALE.</u>

    1.1    <u>Purchase and Sale of the Business Assets.</u>

On the terms and subject to the conditions herein set forth, at the Closing (as defined in Section 2.3 of this Agreement), Seller agrees to sell, transfer, convey, assign and deliver to Buyer, and Buyer agrees to purchase from Seller and accept delivery of, all of Seller's right, title and interest in and to the assets of the Business, including the following tangible, intangible, real, personal and mixed assets, properties and rights of every kind and description, wherever located, which constitute or are used by Seller in connection with the Business, other than the Excluded Assets (as defined in Section 1.2 of this Agreement), all as the same shall exist on the Closing Date (collectively the "Assets"):

        (a)    all cash, bank accounts, security deposits, prepaid items, unbilled costs and fees in connection with the Business, and works in process other than those, if any, specifically identified as an Excluded Asset herein;

        (b)    all merchandise, materials, whole goods, finished goods, component materials now owned or hereafter acquired and held for sale or lease or which contribute to finished products, stationery, purchase orders and other forms, labels, catalogs, brochures, art work, photographs and advertising material, wherever located, which are used or held for use or sale by the Business (collectively, "Inventory");

(c)    all furniture, fixtures, leasehold improvements, machinery, equipment, computer hardware and software and office equipment owned or leased by Seller located at or provided to the Business (the "Equipment");

(d)    Seller's interest in and to all telephone, telecopier, electronic mail, internet address and telex (if any) numbers and telephone and other directory listings utilized in connection with the Business to the extent assignable;

(e)    any and all formulae, trade secrets, patents, trademarks, trade names, inventions, computer software, technology, proprietary know-how, art work, designs, processes and other intellectual property now used by Seller in connection with the Business, (collectively, "Intellectual Property");

(f)    all franchises, permits and licenses, registration, contracts, agreements and commitments, customer lists, restrictive covenants, confidentiality obligations and similar obligations of present and former shareholders, officers and employees of Seller, and any of their predecessors, to the extent same are assignable;

(g)    all rights or choses in action arising out of occurrences before or after the Closing, including without limitation all rights under express or implied warranties relating to the Assets; and

(h)    all books, files, papers, engineering, sales, marketing and other studies, data and plans, records and other data of Seller, including but not limited to all personnel files, computer software and customer and supplier lists and other data bases, if any, relating to the foregoing;

it being the parties' intention that (x) all tangible, intangible, real, personal and mixed property, assets and rights considered by Seller to constitute part of the Business as an ongoing business, wherever located, except as expressly set forth in Sections 1.2 below, are to be conveyed to Buyer as part of the Assets, and (y) the Assets comprise all the business, properties, assets and goodwill employed by the Seller and its affiliates in connection with the Business.

1.2    <u>Excluded Assets</u>.

Notwithstanding the forgoing, it is agreed by the parties to this Agreement that Seller is not selling, and Buyer is not purchasing, any of the following:

1.3    <u>Method of Conveyance</u>.

(a)    The sale, transfer, conveyance, assignment and delivery by Seller of the Assets to Buyer in accordance with Section 1.1 of this Agreement shall be effected on the Closing Date by Seller's execution and delivery of one or more bills of sale and other instruments of conveyance and transfer, substantially in the forms attached hereto and made a part of this Agreement as <u>Exhibit A</u> (the "Bill of Sale").

(b)    At the Closing Seller shall transfer, convey, assign and deliver to Buyer all of the Assets pursuant to this Agreement and the Bill of Sale free and clear of any and all liens, encumbrances, claims, rights of Seller or any third party rights of redemption equities, and other restrictions of any kind or nature whatsoever (collectively, "Liens"), subject only to those liabilities or obligations of Seller in respect of the Business to be specifically assumed by Buyer pursuant to Section 1.4 and Section 2.4 of this Agreement.

(c)    Each party shall pay all costs incurred by such party as a result of the purchase and sale of the Assets hereunder or Buyer's assumption of the Assumed Obligations and the Assumed Liabilities hereunder.

(d)    Seller covenants and agrees that in the event that either (I) any of the Assets cannot be transferred or assigned by it without the consent of or notice to a third party and in respect of which any necessary consent or notice has not as of the Closing Date been given or obtained, or (ii) any Assets are non-assignable by their nature, Seller will use its reasonable best efforts to cause the beneficial interest in and to the same to in any event pass to the Buyer; and Seller covenants and agrees, on and after the Closing Date, to obtain and to secure such consent and give such notice as may be required to effect a valid transfer or transfers of such Assets to the extent such consent reasonably can be obtained.

1.4    Assumed Obligations.

(a)    At the Closing, Buyer shall assume and shall, subject to all rights of offset against third parties, defenses, causes of action, counterclaims and claims of any nature that may be available to Buyer in respect of the Assumed Obligations, agree to satisfy and discharge, as the same shall become due, all of the liabilities and obligations of Seller (the "Assumed Obligations") under:

(i)    the contracts, agreements and commitments of Seller, and obligations to deliver inventory, lease equipment and perform  services in the ordinary course of business (the "Assumed Contracts") including any obligations arising prior to Closing.

(ii)    all permits, registrations, and licenses which are being transferred to Buyer on the Closing Date, if and to the extent transferable, but only to the extent any such liabilities and obligations arise after the Closing and then only in respect of events and time periods occurring after the Closing; and

(iii)    all of Seller's obligations under purchase orders or agreements entered into until the Closing to acquire goods and services solely in connection with the operation of the Business in the ordinary course and which are in existence as of the Closing.

(b)    Buyer agrees to execute and deliver to Seller: (i) the Assignment and Assumption Agreement (the "Assignment and Assumption Agreement"), substantially in the

form of <u>Exhibit B1,</u> which is attached hereto and made a part of this Agreement, to evidence Buyer's assumption of the Assumed Obligations and the Assumed Liabilities (as such term is defined in Section 2.4 below).

2.     <u>PURCHASE PRICE AND CLOSING.</u>

2.1     <u>Purchase Price.</u>

The purchase price (the "Purchase Price") for the Assets to be sold, transferred, conveyed, assigned and delivered by Seller to Buyer pursuant to this Agreement shall be $290,000.

2.2     <u>Payment of Purchase Price.</u>

On the Closing Date, the Buyer shall:

(a)     issue to Seller a promissory note in the form annexed hereto and made a part of this Agreement as <u>Exhibit C</u> (the "Note") in the principal amount of $290,000; and

(b)     assume the liabilities described as being assumed by Buyer in Sections 1.4 and 2.4 hereof.

2.3     <u>Closing.</u>

The closing of the transactions provided for in this Agreement (the "Closing") shall take place at the offices of Mintz & Fraade, P.C. on January 29, 2004, or on such other date as the parties may agree. The date on which the Closing is to be effective is herein referred to as the "Closing Date." The Closing shall be deemed to have occurred at 11:59 P.M. on the Closing Date.

2.4     <u>Assumption of Liabilities.</u>

At the Closing hereunder and except as otherwise specifically provided in this Section 2.4, Buyer shall assume and agree to pay, discharge or perform, as appropriate, the following liabilities and obligations of Seller (the "Assumed Liabilities").

(a)     all liabilities and obligations of Seller arising in the regular and ordinary course of the Business from purchase orders for equipment, parts, supplies purchased by Buyer or in transit to Buyer to the extent that the same remain unpaid and undischarged on the Closing Date.

(b)     all liabilities for accrued sick and vacation pay for all employees of the Business as of the Closing Date.

Notwithstanding the above, in no event shall Buyer assume or incur any liability or obligation under this Section 2.3 with regard to (i) any liability or obligation

that does not arise out of the ordinary course of the Business, (ii) any federal, state or local taxes, including, but not limited to, income, sales and use taxes, as well as any interest and penalties in connection therewith, payable with respect to the Business for any period prior to the Closing Date, (iii) any liability or obligation relating to the Excluded Assets and (iv) any liability or obligation of Seller arising or incurred in connection with, or incident to, the negotiation, preparation and execution of this Agreement, including fees and expenses of counsel, accountants and other experts.

2.5    Allocation of Purchase Price.

The consideration for the Assets will be allocated consistent with the allocation set forth on Schedule 2.5 which is annexed hereto and made a part of this Agreement. It is agreed that such an allocation is fair to both parties and that it will be used as the basis for reporting this transaction for all tax purposes. Each party to this Agreement agrees to prepare its federal and state income tax returns for all current and future tax reporting periods and file Form 8594 (and corresponding state forms) with respect to the transfer of the Assets to Buyer in a manner consistent with such allocation. The allocation of the Purchase Price shall in no event limit the liability of Seller to Buyer with respect to damages, liabilities or expenses incurred by Buyer with respect to any breach of Seller's representations, warranties, covenants or agreements set forth herein.

3.    REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller and Buyer acknowledge that a principal of Buyer has been operating the Business on a day to day basis since (insert date) and is fully familiar with the current assets and liabilities of Seller. As a result, all of the representations and warranties set forth in this Article 3, except for the representations and warranties included in Sections 3.1, 3.2, 3.7 and 3.12, shall be effective as to Seller only for the period prior to (insert date) and shall be effective as to John F. Sitar, in his capacity as an officer and director of Seller as to all relevant dates. The representations and warranties included in Sections 3.1, 3.2, 3.7 and 3.12 shall apply without any limitation. Accordingly, Seller hereby represents and warrants to Buyer as follows:

3.1    Corporate Organization.

(a)    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of New York. Seller has all requisite corporate power and authority to carry on the Business as the same is now being conducted and to own, lease and operate it's properties and assets in the places where such business is now conducted and where such properties and assets are now owned, leased or operated.

(b)    Seller neither owns nor leases any property, and does not employ any person or maintain any agent, with respect to the Business, outside of the New York.

(b)    Seller neither owns nor leases any property, and does not employ any person or maintain any agent, with respect to the Business, outside of the New York.

### 3.2    Authorization.

(a)    Seller has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement and to carry out the transactions contemplated hereby; (b) Seller has taken all necessary corporate action required by law or otherwise to be taken by Seller to authorize Seller's execution and delivery of this Agreement and the consummation by Seller of the transactions contemplated hereby; and (c) this Agreement has been duly and validly executed and delivered by Seller and constitutes a valid and binding agreement of and upon Seller enforceable against Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and general principles of equity.

### 3.3    No Violation.

Except for the required consents of third parties neither the execution and delivery of this Agreement by Seller nor the consummation by Seller of the transactions contemplated hereby will violate any provision of the Certificate of Incorporation or the by-laws of Seller, or be in conflict with, or constitute a material default (or an event which, with or without notice, lapse of time or both, would constitute a material default) under, or result in the termination or invalidity of, or accelerate the performance required by, or cause the acceleration of the maturity of any of the Assumed Obligations, or result in the creation or imposition of any security interest, lien or other encumbrance upon any of the Assets under any agreement or commitment to be assumed by Buyer pursuant to this Agreement to which Seller is a party or by which Seller is bound or to which any of the Assets is subject, or violate any statute or law or any judgment, decree, order, regulation or rule of any domestic or (to the knowledge of Seller) foreign court or domestic or (to the knowledge of Seller) foreign government authority applicable to Seller, or any of the Assets.

### 3.4    Brokers and Finders.

No person has been authorized by Seller, or by anyone acting on behalf of Seller or any of its officers, directors, employees or trustees, to act as a broker, finder or in any other similar capacity in connection with the transactions contemplated by this Agreement in such manner as to give rise to any valid claim against Buyer or Seller for any broker's or finder's fee or commission or similar type of compensation.

### 3.5    Real Property.

(a)    Real Property Defined.  All real property (including, without limitation, all interests in and rights to real property) and improvements located thereon which are owned or leased by Seller and used in connection with the Business or

included in the Assets are listed in <u>Section 3.5(b) of the Disclosure Schedule</u> (the "Real Property").

(b)     <u>Leased Real Property.</u>  With respect to the Real Property that is leased by Seller, all of which property is identified in <u>Section 3.5(b) of the Disclosure Schedule</u> (the "Leased Property"):

    (i)     Seller has delivered to Buyer a true and complete copy of every lease and sublease to which Seller is a tenant or subtenant (the "Leases"), and has described each Lease in <u>Section 3.5(b) of the Disclosure Schedule</u> by listing the name of the landlord or sublandlord, the address of the leased premises, the commencement and expiration dates of the current term, the security deposited by Seller with the landlord or sublandlord, if any, and the monthly rental (including base and all additional rents).

    (ii)     each Lease is, and at Closing shall be, in full force and effect and has not been assigned, modified, supplemented or amended except as listed on the Disclosure Schedule, and neither Seller nor, to Seller's knowledge, the landlord or sublandlord under any Lease is in default under any of the Leases, and to Seller's knowledge, no circumstances or state of facts presently exists which, with the giving of notice or passage of time, or both, would permit the landlord or sublandlord under any Lease to terminate any Lease; and

    (iii)     subject to Section 1.3(d) above, at Closing Seller shall assign to the Buyer all right, title and interest of Seller in and to all Leases (and shall deliver to Buyer original copies of all consents required for such assignments) and all security deposits made by Seller pursuant to any of the Leases, including, but not limited to, the security deposits listed on the Disclosure Schedule, together with all interest earned on such deposits.

(c)     <u>Eminent Domain.</u>  Seller has received no written notices, nor, to Seller's knowledge, any oral notice, and has no actual knowledge, that any governmental body having the power of eminent domain over the Real Property has commenced or intends to exercise the power of eminent domain or a similar power with respect to all or any part of the Real Property.

3.6     <u>Patents, Copyrights, Trademarks, Trade Names and Licenses.</u>

(a)     There are no licenses (whether as licensor, licensee or otherwise) or other contracts or commitments to which Seller is a party relating to any patent, trademark, service mark, trade name or copyright (the "Intellectual Property"), or to which it or any of its assets is otherwise subject.

(b)     During the past three (3) years (i) no claims have been asserted by any person against or otherwise in respect of the use by Seller of any of the Intellectual

Property, or challenging or questioning the validity or effectiveness of any license or agreement referred to in this Section 3.6, and, to the knowledge of Seller, there is no valid basis for any such claim; (ii) Seller has not received notice of any allegation that it has infringed upon any patent, trademark, service mark, trade name or copyright or misappropriated or misused any invention, trade secret or other proprietary information of any other person entitled to legal protection and (iii) Seller has not asserted any claim of such infringement, misappropriation or misuse against any person. Seller has good and valid title to, or otherwise possesses adequate rights to use all patents, trademarks, service marks, trade names, copyrights, inventions, trade secrets and other proprietary information necessary to conduct its business. No shareholder, officer, director or employee of Seller or affiliates of any of the foregoing owns or has any interest in any of the Intellectual Property.

3.7     Taxes.

(a)     For any and all periods still open or subject to audit, Seller or its predecessors have duly filed all tax reports and returns (including information returns) required to be filed by it or any of its predecessors relating to or covering the Business and each of such reports and returns were true, correct and complete.

(b)     For any and all periods still open or subject to audit, Seller has duly paid all taxes and other charges due or claimed to be due or shown on any return or declaration to be due from it to any federal, state, local or foreign taxing authority (including, without limitation, those due in respect of properties, income, franchises, licenses, sales and payrolls); and there are no tax liens upon any of the Assets except liens for current taxes not yet due.

(c)     For any and all periods still open or subject to audit, all taxes and other assessments and levies required to be withheld by Seller from customers with respect to the provision of services, or from or on behalf of employees for income, social security, unemployment insurance and any other taxes or similar charges have been collected or withheld and either paid to the appropriate government agency or properly set aside and held in accounts for such purpose.

3.8     Contracts and Commitments

(a)     Seller is not in default, nor to Seller's knowledge is there any basis for any valid claim of default against Seller, and to the best of Seller's knowledge no other party is in default, under any contract, agreement, commitment or restriction which is an Assumed Obligation, and no event of default has occurred which (whether with or without the giving of notice, lapse of time, or both, or the happening or occurrence of any other event) would constitute a default thereunder;

(b)     Seller is not a party to or bound by any consulting agreement;

(c)  Seller is not a party to or bound by any outstanding powers of attorney or any other outstanding obligations or liabilities (whether absolute, accrued, contingent or otherwise), as guarantor, surety, co-signer, endorser, co-maker, indemnitor or otherwise in respect of the obligation of any other person, corporation, partnership, joint venture, association, organization or other entity;

(d)  Seller is not a party to or bound by any partnership or joint venture agreement, or any written or binding oral royalty, distribution, agency, territorial or license agreement;

(e)  There are no credit cards issued to any of Sellers employees or for which Seller is directly liable and for which any liability will be sought to be imposed on Buyer;

(f)  Seller has no debt obligation for borrowed money, except as referred to in Section _____ of the Disclosure Statement;

(g)  Seller has no outstanding loans to any person; and

3.9  Insurance.

(a)  Section 3.9 of the Disclosure Schedule contains an accurate and complete list of all policies of fire, liability, keyman life insurance, workers' compensation, products liability, and other forms of insurance owned or held by or beneficially for Seller. All such policies are in full force and effect and will not be canceled or modified by Seller prior to Closing without the express written consent of Buyer (except to extend the maturity dates thereof), all premiums with respect thereto covering all periods up to and including the Closing Date have been or will be paid by Seller, and no written, or to Seller's knowledge oral, notice of cancellation or termination has been received by Seller with respect to any such policy.

(b)  The aforesaid policies are sufficient for Seller's compliance with, to Seller's knowledge, all requirements of law and of all material agreements to which Seller is a party; are valid, outstanding and enforceable policies; are, in the opinion of management of Seller, in amounts customarily deemed to be adequate and cover all risks customarily insured against in the type of business conducted by Seller in the locality where Seller operates its business; have been issued by reputable insurance companies which are in good standing, adequately capitalized and actively engaged in the insurance business; and in the judgment of Seller provide adequate insurance coverage for its assets and operations.

3.10  Labor Difficulties.

(a)  to Seller's knowledge, there are no charges or complaints of discrimination pending before the United States Equal Employment Opportunity Commission or any state, local or foreign agency against Seller;

(b)   to the best of Seller's knowledge, Seller, does not presently employ, and at no time during the past year did it employ, any illegal alien;

3.11   Litigation, Judgments and Decrees.

(a)   There currently is no action, suit or proceeding of any nature whatsoever, at law or in equity or both, by or before any domestic or foreign court, or any proceeding or claim pending (or, to the best of Seller's knowledge, threatened) before any government or other regulatory or administrative agency, arbitration tribunal, board, bureau, authority or commission involving Seller or the Business, in any such case which would have a material adverse effect on the Business or which questions or challenges the validity of this Agreement or any action taken or to be taken by Seller pursuant to this Agreement or in connection with the transactions contemplated hereby.

(b)   Seller is not subject to any judgment, order, award or decree of any domestic or, foreign court or government or other regulatory or administrative agency, arbitration tribunal, board, bureau, authority or commission (i) which has or, to Seller's knowledge, may have a material adverse effect on Seller's practices in the Business or on its ability to acquire any property or conduct its Business in any area, (ii) which is or will be binding on Buyer, or (iii) with respect to which Seller is in default.

3.12   ERISA; Employee Benefit Plans.

(a)   As used in this Section 3.12, the term "Plan" means any bonus, deferred compensation, pension, profit-sharing, retirement, stock purchase, stock option, phantom stock, medical or any other benefit plan, arrangement or practice, whether written or unwritten including but not limited to any such plan, arrangement or practice which constitutes an "employee welfare benefit plan" within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended and the regulations thereunder ("ERISA") or an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA, whether now existing or previously terminated, covering any employee of the Business, including any such plans that may have been terminated within the last three years. Section 3.12 of the Disclosure Schedule sets forth a complete list of all Plans maintained by Seller. Seller has no legally binding commitment, whether formal or informal, to create any additional such plan or arrangement.

(b)   To Seller's knowledge, except as set forth in Section 3.12 of the Disclosure Statement, all of Seller's Plans are, or, with regard to any terminated Plan, were in all material respects in compliance in operation and in form with the currently prescribed requirements prescribed by any and all statutes, orders or governmental rules or regulations currently in effect with respect to such Plans, including, but not limited to ERISA and the Code, and there are no pending or, to the Seller's knowledge, threatened claims, lawsuits or arbitrations (other than

routine claims for benefits) which have been asserted or instituted against the Seller, any Plan or the assets of any trust for any Plan.

3.13     Compliance with Law; Necessary Authorizations.

(a)     In conducting the Business, Seller has in all material respects duly complied and is presently in all material respects duly complying with all applicable laws (whether statutory or otherwise), rules, regulations, orders, building and other codes, zoning and other ordinances, permits, licenses, authorizations, judgments and decrees of all federal, state, local or, to Seller's knowledge, foreign governmental authorities, including, but not limited to, the Federal Occupational Safety and Health Act, ERISA, National Labor Relations Act, Worker Adjustment and Retraining Notification Act, Civil Rights Act, Immigration Reform and Control Act of 1986, Age Discrimination in Employment Act, the Water Pollution Control Act and all applicable domestic and foreign laws, rules and regulations relating to the safe conduct of business, employment discrimination, wages and hours, employment of illegal aliens, collective bargaining, the payment of withholding and social security taxes, product labeling, antitrust, consumer protection, occupational safety and health, consumer product safety, the importation of goods, product liability, currency exchange, securities and trading-with-the-enemy matters, except where the failure to so comply would not have a material adverse effect on the Business.

(b)     Seller (i) has no knowledge and (ii) has not received any written notification from any third party (including but not limited to employees and government agencies) of any present or, within the past three years, past failure so to comply or has knowledge of any present condition, activity, incident, action or plan which may interfere with or prevent continued compliance with any laws, rules or regulations or which may give rise to any common law or statutory liability, or otherwise form the basis of any material claim, action, suit, proceeding, hearing or investigation which would have a material adverse effect on the Business.

(c)     Seller has duly obtained all permits, concessions, grants, franchises, licenses and other government authorizations and approvals necessary for the conduct of the Business except where such failure would not have a material adverse effect on the Business; each of the foregoing is in full force and effect; to the best of Seller's knowledge, there are no proceedings pending or threatened which may result in the revocation, cancellation, suspension or modification of any thereof.

3.14     Disclosure.

No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedule contains any untrue statement of any material fact or omits to state any material fact necessary, in light of the circumstances under which it was made, in order to make the statements made herein or therein not misleading.

4.    REPRESENTATIONS AND WARRANTIES OF THE BUYER.

Buyer represents and warrants to Seller as follows:

4.1    Corporate Organization

Buyer is a corporation duly organized, validly existing and in good standing under the laws of its State of Incorporation. Buyer has full corporate power and authority to carry on its businesses as they are now being conducted and to carry on the Business being acquired hereunder and to own, lease and operate its properties and assets as and in the places where such businesses are now conducted and where such properties and assets are now owned, leased or operated. Buyer is, or will be at the time of the Closing, duly qualified or licensed to do business as a foreign corporation in all jurisdictions where the failure to so qualify would have a material adverse effect on the business, financial condition, properties or operations of Buyer, after taking into consideration the purchase of the Assets and the Business hereunder.

4.2    Authorization.

Buyer has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and to carry out the transactions contemplated hereby. Buyer has taken all action required by law or otherwise to be taken by Buyer, to authorize Buyer's, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes a valid and binding agreement of and upon the Buyer enforceable against the Buyer in accordance with its terms, except that such enforcement may be subject to (i) shareholder approval (ii) bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (iii) general principles of equity.

4.3    No Violation.

Neither the execution and delivery of this Agreement by the Buyer nor the consummation by the Buyer of the transactions contemplated hereby will violate any provision of the Certificate of Incorporation or by-laws of the Buyer, or be in conflict with, or constitute a material default (or an event which, with or without notice, lapse of time or both, would constitute a material default) under, or result in the termination or invalidity of, or accelerate the performance required by, or cause the acceleration of the maturity of any obligations or liabilities of Buyer or result in the creation or imposition of any security interest, lien or other encumbrance upon any of its assets or properties under any agreement or commitment to which Buyer is a party or by which it is bound or to which any of its assets are subject, or violate any statute or law or any judgment, decree, order, regulation or rule of any domestic or foreign court or governmental authority applicable to the Buyer. For purposes of this Agreement, "to Buyer's knowledge" "to the best of Buyer's knowledge" or any similar formulation thereof shall mean to the actual knowledge of any of the current: (i) quality assurance and/or quality control directors of Buyer. (ii) hazardous material directors of Buyer, or (iii) officers and directors of Buyer or Buyer's Parent.

manner as to give rise to any valid claim against Buyer or Seller for any broker's or finder's fee or commission or similar type of compensation.

4.5    Litigation.

There is no action, suit or proceeding or any claim or investigation of any nature whatsoever (including, but not limited to, products liability), at law or in equity or both, by or before any domestic or foreign court or government or other regulatory or administrative agency, arbitration tribunal, board, bureau, authority or commission pending or, to the Buyer's knowledge, which questions or challenges the validity of this Agreement or any action taken or to be taken by the Buyer pursuant to this Agreement or in connection with the transactions contemplated hereby; and to the best of their knowledge, there is no valid basis for any such action, suit, inquiry proceeding or investigation.

4.6    Consents.

No consent, approval, authorization or other order of, or registration, qualification or filing with, any regulatory body, administrative agency, or any other person or entity is required of Buyer in connection with the execution, delivery and performance of this Agreement or the consummation by Buyer of the transactions contemplated hereby which consent, approval, etc. has not been obtained or will not be obtained on or prior to the Closing Date.  Accurate and complete copies of each of the foregoing which have been obtained or made have been delivered to Seller at or prior to the date of this Agreement.

4.7    Restrictions During Note Term

Buyer and Steven Sitar, as the majority owner of Buyer, each represent and warrant to Seller that during the term of the Note (i) Steven Sitar shall not transfer any ownership interest or voting rights that would prevent him from having a majority voting interest as to any issue on which shareholders may vote, and shall not pledge or otherwise encumber his shares (ii) Buyer shall not issue shares that would cause Steven Sitar to hold less than a majority interest in Buyer, (iii) Buyer shall not enter into any merger or other similar transaction that would result in Steven Sitar owning less than a majority interest in Buyer and (iv) Buyer shall not enter into any transaction outside the normal course of the Business (it being acknowledged that Buyer's business shall be the same as Seller's business) without either (i) obtaining the consent of Seller or John Sitar or (ii) paying the balance due under the Note.

5.    AGREEMENTS PENDING CLOSING.

5.1    Agreements of Seller Pending the Closing.  Seller covenants and agrees that, pending the Closing and except as otherwise agreed to in writing by Buyer:

(a)    Business in the Ordinary Course.  The Business shall be conducted solely in the ordinary course consistent with past practice.  Steven Sitar shall continue to manage the day to day activities of the Business and Buyer shall have no right

(a) <u>Business in the Ordinary Course.</u> The Business shall be conducted solely in the ordinary course consistent with past practice. Steven Sitar shall continue to manage the day to day activities of the Business and Buyer shall have no right hereunder to terminate this Agreement based on any action taken by Steven Sitar in his role as manager of the Business.

5.2 <u>Agreements of Buyer Pending the Closing.</u> Buyer covenants and agrees that, pending the Closing and except as otherwise agreed to in writing by Seller:

(a) <u>Actions of Buyer.</u> Buyer will not knowingly take any action which would result in a breach of any of its representations and warranties hereunder. Furthermore, Buyer shall cooperate with Seller and use its reasonable best efforts to cause all of the conditions to the obligations of Buyer and Seller under this Agreement to be satisfied on or prior to the Closing Date.

6. <u>CONDITIONS PRECEDENT TO THE CLOSING.</u>

6.1 <u>Conditions Precedent to Buyer's Obligations.</u> All obligations of Buyer under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

(a) <u>Representations and Warranties True as of the Closing Date.</u> The representations and warranties of Seller and Seller's Parent contained in this Agreement or in any schedule, certificate or document delivered by Seller or Seller's Parent to Buyer pursuant to the provisions of this Agreement shall have been true in all material respects on the date of this Agreement without regard to any schedule updates furnished by Seller after the date of this Agreement and shall be true in all material respects on the Closing Date with the same effect as though such representations and warranties were made as of such date.

(b) <u>Compliance with this Agreement.</u> Each of Seller and Seller's Parent shall have performed and complied in all material respects with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c) <u>No Threatened or Pending Litigation.</u> On the Closing Date, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or be pending before any court or governmental or regulatory official, body or authority in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened.

(d) <u>Material Adverse Changes.</u> The assets or the operations of the Business taken as a whole, shall not have been and shall not be threatened to be materially adversely affected in any way as a result of any event or occurrence (except as a result of general economic conditions).

(e)     Third Parties' Consent. With respect to the leases to be transferred as part of the Assets, Seller shall have obtained the consent of any third party to such lease to the Assignment and Assumption Agreement with respect to said lease.

6.2     Conditions Precedent to the Obligations of Seller.  All obligations of Seller under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

(a)     Representations and Warranties True as of the Closing Date.  The representations and warranties of Buyer contained in this Agreement or in any list, certificate or document delivered by Buyer or Parent to Seller pursuant to the provisions of this Agreement shall have been true in all material respects on the date of this Agreement and shall be true in all material respects on the Closing Date with the same effect as though such representations and warranties were made as of such date.

(b)     Compliance with this Agreement.  Each of Buyer and Parent shall have performed and complied in all material respects with all agreements and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.

(c)     No Threatened or Pending Litigation.  On the Closing Date, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or be pending before any court or governmental or regulatory official, body or authority in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened.

(d)     Assignment and Assumption Agreement.  Buyer shall have executed and delivered the Assignment and Assumption Agreements.

6.3     Termination.

(a)     Methods of Termination.  Anything in this Agreement to the contrary notwithstanding, the transactions contemplated hereby may be terminated and abandoned at any time prior to the Closing:

(i)     by mutual consent of the Buyer and Seller; or

(ii)     by Seller if, as of the Closing Date, any of the conditions set forth in Section 6.2 shall not have been met;

(iii)     by Buyer if, as of the Closing Date, any of the conditions set forth in Section 6.1 shall not have been met; or

(b)    Procedure Upon Termination.   In the event of termination and abandonment pursuant to Section 6.3(a) of this Agreement, written notice thereof shall forthwith be given to the other party to this Agreement and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned without further action by the Buyer or the Seller.  In the event of termination of this Agreement as expressly provided in Section 6.3(a) above, this Agreement shall forthwith become void and neither Buyer, on the one hand, nor Seller on the other, shall have any liability to the other, except for either party's breach of any of its obligations which breach shall be existing at the time of such termination.

7.    CERTAIN COVENANTS AND AGREEMENTS

7.1    Consummation of Transactions: Further Assurances.

(a)    Each of the parties agrees to use its reasonable best efforts to bring about the satisfaction of the conditions required to be performed, fulfilled or complied with by it hereunder and to take or cause to be taken, all action, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement as expeditiously as practicable.

(b)    In case at any time after the Closing any further action is reasonably necessary or desirable to carry out the purposes of this Agreement, the appropriate party will take all such necessary action, including without limitation, the execution and delivery of such further instruments and documents as may be reasonably requested by the other party or parties for such purposes or otherwise to complete or perfect the transactions contemplated hereby.  After the Closing, Buyer and Seller shall cooperate fully with the other and shall make available to the other and to any taxing authority all information, records or documents in its possession which are reasonably requested in connection with the preparation of any tax returns or in connection with any tax liability of Seller for any period prior to the Closing, and otherwise shall cooperate in connection with all matters, such as but not limited to litigations and personnel matters, involved in the transfer of the Assets and the Business operations from Seller to Buyer.

7.2    Risk of Loss.

Prior to the Closing Date, the risk of loss or damage to, or destruction of, any or all of the Business and any or all of the Assets shall remain with Seller.

7.3    Payment of Taxes.

Seller shall file when due, giving effect to all applicable extension provisions, all federal, state, local and foreign tax returns required to be filed by it (including but not limited to income, sales, use and payroll taxes) for all periods to the Closing Date and shall pay all taxes, interest or

penalties (i) shown on, or which are otherwise due and payable pursuant to, such returns, (ii) which shall become due with respect to any such period pursuant to any deficiency notice or similar notice or (iii) which otherwise shall become due with respect to any such period.

7.4    Best Efforts to Obtain Consents.

Each of Seller and Buyer shall use its reasonable best efforts to obtain promptly all the consents and authorizations of third parties for which it is responsible to obtain, and to cooperate with the other as the other may reasonably request, to make all filings, if any, and to give all notices to third parties which may be required in order to effect the transactions contemplated by this Agreement.

7.5    Other Government Filings.

Buyer and Seller agree to cooperate with each other in filing any necessary applications, reports or other documents with any federal or state authorities (including federal, state or local taxing authorities as to the allocation, if agreed, of the Purchase Price to the Assets) having jurisdiction with respect to the transactions contemplated by this Agreement and in seeking necessary consultation with and favorable action by any such agencies, authorities or bodies.

8.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION.

8.1    Survival of Representations.

All representations and warranties contained in this Agreement shall survive the Closing for a period (the "Survival Period") of three years after the Closing Date, except for those related to the representations set forth in Sections 3.7 and 3.12 of this Agreement which shall continue through the applicable statute of limitations and those related to third party claims in connection with Excluded Obligations which shall survive the Closing for a period of five years.

8.2    Indemnification by Buyer.

Buyer agrees to indemnify, protect, defend and hold harmless Seller and any Affiliate thereof and each of its shareholders, any parent, subsidiary or affiliate thereof and all directors, officers, employees, attorneys, and agents of any of the foregoing (the "Seller Group"), at any time after the Closing and during the appropriate Survival Period (except that such indemnification obligations shall continue beyond the Survival Period if a Notice of Claim for indemnification shall be delivered to Parent and Buyer prior thereto, in which case such indemnification obligations shall continue until the claim as to which such notice has been given is resolved and any applicable indemnification obligations have been satisfied), from and against all demands, claims, actions or causes of action, assessments, deficiencies, taxes, losses, damages, liabilities, costs and expenses, including without limitation, interest, penalties and reasonable attorneys' fees and expenses (collectively "Losses"), asserted against, resulting from, imposed upon or incurred by the Seller Group, directly or indirectly, arising out of or in connection with (a) the breach or inaccuracy of any of the representations or warranties of Buyer made in or pursuant to this Agreement; (b) any breach of any covenant or agreement of Buyer contained in this Agreement; or (c) any failure to pay any obligation, liability, debt or

commitment of the Seller which is an Assumed Obligation or Assumed Liability, whether or not paid by Seller; or (d) any and all obligations, liabilities, debts or commitments in connection with the Assets or the operation of the Business arising after the Closing to the extent that they arise after the Closing and only in respect of such time period.

8.3    Indemnification by Seller.

Seller agrees to indemnify, protect, defend and hold harmless Buyer and each of its shareholders, any parent, subsidiary or affiliate thereof and all directors, officers, employees, attorneys and agents of any of the foregoing (the "Buyer Group"), at any time after the Closing and during the appropriate Survival Period (except that such indemnification obligations shall continue beyond the Survival Period if a Notice of Claim for indemnification shall be delivered to Seller and Seller's Parent prior thereto, in which case such indemnification obligations shall continue until the claim as to which such notice has been given is resolved and any applicable indemnification obligations have been satisfied), from and against all Losses asserted against, resulting from, imposed upon or incurred by the Buyer Group or any member thereof, directly or indirectly, arising out of or in connection with (a) the breach or inaccuracy or alleged breach or inaccuracy of any of the representations or warranties of Seller made in or pursuant to this Agreement; (b) any breach of any covenant or agreement of Seller contained in this Agreement; or (c) any obligation, liability, debt or commitment of the Seller which is not an Assumed Obligation or an Assumed Liability (or is an Excluded Obligation), whether or not paid by Buyer.

8.4    Third Party Claims.

(a)    If any demand, claim, action or cause of action, suit, proceeding or investigation (collectively, the "Claim") is brought against an Indemnified Party for which the Indemnified Party intends to seek indemnity from the other party to this Agreement (the "Indemnifying Party"), then the Indemnified Party within twenty-one (21) days after such Indemnified Party's receipt of the Claim, shall notify the Indemnifying Party pursuant to Article 9.4 of this Agreement which notice shall contain a reasonably thorough description of the nature and amount of the Claim (the "Claim Notice"). The Indemnifying Party shall have the option to undertake, conduct and control the defense of such claim or demand. Such option to undertake, conduct and control the defense of such claim or demand shall be exercised by notifying the Indemnified Party within twenty (20) days after receipt of the Claim Notice pursuant to Article 9.4 of this Agreement (such notice to control the defense is hereinafter referred to as the "Defense Notice"). The failure of the Indemnified Party to notify the Indemnifying Party of the Claim shall not relieve the Indemnifying Party from any liability which the Indemnifying Party may have pursuant to this Article 8 of this Agreement except to the extent that such failure to notify the Indemnifying Party prejudices the Indemnifying Party. The Indemnified Party shall use all reasonable efforts to assist the Indemnifying Party in the vigorous defense of the Claim. All costs and expenses incurred by the Indemnified Party in defending the Claim shall be paid by the Indemnifying Party. If, however, the Indemnified Party desires to participate in any such defense or settlement, it may do so at its sole cost and expense (it being understood that the Indemnifying Party shall be entitled to control the defense). The Indemnified Party shall not settle the Claim.   If the Indemnifying Party does not elect to control the defense of the Claim, within the aforesaid twenty (20) day period by proper notice pursuant to Article 9.4 of this

Agreement, then the Indemnified Party shall be entitled to undertake, conduct and control the defense of the Claim (a failure by the Indemnifying Party to send the Defense Notice to the Indemnified Party within the aforesaid twenty (20) day period by proper notice pursuant to Article 9.4 of this Agreement shall be deemed to be an election by the Indemnifying Party not to control the defense of the Claim); provided, however, that the Indemnifying Party shall be entitled, if it so desires, to participate therein (it being understood that in such circumstances, the Indemnified Party shall be entitled to control the defense). Regardless of which party has undertaken to defend any claim, the Indemnifying Party may, without the prior written consent of the Indemnified Party, settle, compromise or offer to settle or compromise any such claim or demand; provided however, that if any settlement would result in the imposition of a consent order, injunction or decree which would restrict the future activity or conduct of the Indemnified Party, the consent of the Indemnified Party shall be a condition to any such settlement. Notwithstanding the foregoing provisions of this Article 8 of this Agreement, as a condition to the Indemnifying Party either having the right to defend the Claim, or having control over settlement as indicated in this Article 8 of this Agreement, the Indemnifying Party shall execute an agreement acknowledging its liability for indemnification pursuant to this Article 8 of this Agreement. Whether the Indemnifying Party shall control and assume the defense of the Claim or only participate in the defense or settlement of the Claim, the Indemnified Party shall give the Indemnifying Party and its counsel access, during normal business hours, to all relevant business records and other documents, and shall permit them to consult with its employees and counsel.

(b)     The amount of any Losses for which indemnification is available shall be computed without regard to the tax effect of any such loss or indemnification.

(c)     In the event of payment by an Indemnifying Party to the Indemnified Party as contemplated in this Section 8, the Indemnifying Party shall be subrogated to and shall stand in the place of the Indemnified Party as to any events or circumstances in respect of which the Indemnified Party may have any right or claim against any third party relating to such event giving rise to the claim for which the Indemnifying Party shall have made payment to the Indemnified Party. The Indemnified Party shall cooperate with the Indemnifying Party in any reasonable manner in prosecuting any such subrogated right or claim.

8.5     Limitations on Indemnification.

(a)     The Indemnifying Party shall not be obligated for any indirect, special or consequential damages or lost profits incurred by the Indemnified Party.

(b)     Seller shall not be liable to the Buyer for indemnification pursuant to this Agreement in excess of the amount of the outstanding principal balance of the Note as of the time any claim is asserted, reduced by the amount of any then pending claim against Seller pursuant to this Article 8 (the "Maximum Amount").

8.6     Successors.

The merger, consolidation, liquidation, dissolution or winding up of, or any similar transaction with respect to, the Indemnifying Party shall not affect in any manner the obligations of the Indemnifying Party pursuant to this Section or any other term or provision of this

Agreement, and the Indemnifying Party covenants and agrees to make adequate provision for its liabilities and obligations hereunder in the event of any such transaction.

   8.7   Time Action Must be Brought.

   No action may be brought under this Article 8 unless brought three years from the date of Closing except actions related to the representation set forth in Section 3.7 and 3.12 which shall be brought by the expiration of the applicable statute of limitation plus one week.

   8.8   Reasonable Costs, Etc.     The indemnification, which is set forth in this Article 8 of this Agreement shall be deemed to include not only the specific liabilities or obligation with respect to which such indemnity is provided, but also all counsel fees, reasonable costs, expenses and expenses of settlement relating thereto, whether or not any such liability or obligation shall have been reduced to judgment.


9.   MISCELLANEOUS PROVISIONS.

   9.1   Amendment.

   This Agreement may be amended, modified or supplemented by the parties to this Agreement only by a written instrument duly signed by or on behalf of the party to be charged therewith.

   9.2   Waiver of Compliance.

   Any failure of Seller, on the one hand, or Buyer, on the other hand, to comply with any obligation, covenant, agreement or condition herein may be expressly waived in writing by an authorized officer of Buyer or Seller, respectively, but such waiver or failure to insist upon strict compliance with any such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

   9.3   Expenses.

   (a)   Whether or not the transactions contemplated by this Agreement are consummated, each of the parties to this Agreement shall pay the fees and expenses of their respective counsel, accountants and other experts, and shall pay all other expenses incurred by it incident to the negotiation, preparation, execution and consummation of this Agreement.

   (b)   The provisions of Section 9.3 shall survive any termination of this Agreement.

   9.4   Notices.

   All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given (i) four business days subsequent to mailing if mailed by express, certified or registered mail, with postage prepaid, in

the continental United States; (ii) two business days subsequent to pick up by such courier if sent by a nationally or internationally recognized overnight courier service that regularly maintains records of items picked up and delivered; or (iii) when transmitted if sent by telecopier, provided that a written acknowledgment of receipt signed by or on behalf of the recipient of the telecopy is transmitted back to the sender by the recipient, as follows:

      If to Seller:

      with a copy to:      Kevin J. McGraw
                      Mintz & Fraade, P.C.
                      488 Madison Avenue, Suite 1100
                      New York, NY 10022
                      Telecopier No.: (212) 486-0701

or to such other person or address as Seller shall furnish to Buyer in writing.

      If to Buyer:

      with a copy to:      Kevin J. McGraw
                      Mintz & Fraade, P.C.
                      488 Madison Avenue
                      New York, New York 10022

or to such other person or address as Buyer shall furnish to Seller in writing.

    9.5      <u>Binding Effect: Assignment.</u>

      This Agreement and all of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective administrators, legal representatives, successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or assignable by any of the parties to this Agreement without the prior written consent of the other party, except (i) by operation of law, (ii) that Buyer may freely assign this Agreement or all or any rights or obligations it may have hereunder to a direct or indirect wholly-owned subsidiary of Buyer or Parent, (iii) that Buyer may assign all of its rights but not its obligations under this Agreement to any institution providing financing or re-financing for the transactions contemplated by this Agreement, and (iv) that Seller may assign all of its rights and its obligations under this Agreement to Seller's Parent.

    9.6      <u>Remedies.</u>

      Except that the indemnification provision of Section 8 above is the exclusive remedy for breaches of representations, warranties and covenants as provided therein, the parties acknowledge and agree that each party to this Agreement may seek any remedies in equity or law that may be available to it. Nothing herein shall prevent the Parties from impleading or

interpleading the other party at any time in an action brought by a third party relating to what would otherwise have been an indemnifiable claim.

9.7    Governing Law.

This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to the principles of conflict of law.

9.8    Counterparts.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

9.9    Headings.

The headings of the sections of this Agreement are inserted for convenience only and shall not constitute a part or affect in any way the meaning or interpretation of this Agreement.

9.10    Entire Agreement.

(a)    This Agreement sets forth the entire agreement and understanding of the parties to this Agreement in respect of the subject matter contained herein, and supersedes all prior agreements, promises, letters of intent, covenants, arrangements, communications, representations or warranties, whether oral or written, by any party to this Agreement or by any Related Person of any party to this Agreement.

(b)    All Exhibits attached to this Agreement, the Disclosure Schedule, any exhibits thereto and all certificates, documents and other instruments delivered or to be delivered pursuant to the terms of this Agreement are hereby expressly made a part of this Agreement as fully as though set forth herein, and all references herein to the terms "this Agreement," "hereunder," "herein," "hereby" or "hereto" shall be deemed to refer to this Agreement and to all such writings.

9.11    Third Parties.

Except as specifically set forth or referred to herein, nothing in this Agreement, express or implied, is intended or shall be construed to confer upon or give to any person (including but not limited to Seller's employees), firm, partnership or corporation other than the parties to this Agreement and their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

9.12    Severability.

The invalidity of any one or more of the words, phrases, sentences, clauses, sections or subsections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part of this Agreement, all of which are inserted conditionally

on their being valid in law, and, in the event that any one or more of the words, phrases, sentences, clauses, sections or subsections contained in this Agreement shall be declared invalid by a court of competent jurisdiction, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, section or sections, or subsection or subsections had not been inserted.

## [SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be duly executed as of the day and year first above written.

Corstar Business Computing Co., Inc.

By: _____

Name: John F. Sitar

Title: President

Corstar Communications, LLC

By: _____

Name: Steven Sitar

Title: President

# PROMISSORY NOTE

$290,000.00                                                          January 29, 2004

FOR VALUE RECEIVED, the undersigned promises to pay to Corstar Business Computing Co., Inc., in the manner hereinafter specified, the principal sum of Two Hundred Ninety Thousand Dollars ($290,000.00) without interest.

The said principal shall be payable in lawful money of the United States of America at 513 Dartmoor Way SW, Ocean Isle Beach, North Carolina 28469, or at such place as may hereafter be designated by written notice from the holder to the maker hereof, on the date and in the manner following:

Principal payments of Five Thousand Dollars ($5,000.00) to be made on February 1, 2003 and on the first day of each succeeding month until November 1, 2007, when the entire principal balance shall be due.

This note may be prepaid in whole or in part at any time without penalty or premium.

In the event any payment set forth herein shall not be paid within ten (10) days of the date when due, the then remaining principal balance shall become due, at the election of the holder, and interest shall become due in the maximum amount provided by law. In the event of a breach of the terms of this note by the maker, any attorneys fees or other costs of collection, shall be added to the balance due hereunder.

The payment terms set forth above may be accelerated pursuant to the terms of a certain Asset and Business Purchase Agreement between the parties of even date, and the relevant portions of that Agreement are incorporated herein by reference.

Whenever used herein the terms "holder", "maker" and "payee" shall be construed in the singular or plural as the context may require or admit.

Corstar Communications, LLC


Steven Sitar, President